**Mark R. Sylvester**
**Janna Berke**
**Christopher M. Colorado**
**Kim Han**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-9143 (Colorado)**
**coloradoch@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>        -against-<br><br>**JIANQING LI,**<br><br>                    **Defendant.** | **COMPLAINT**<br><br>**1:26 Civ. 4778  (     )**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against JianQing Li ("Li"), alleges as follows:

**SUMMARY**

1.      This is an insider trading case. From February 2024 through October 2025, Li traded in the securities of at least twelve healthcare companies on confidential information he obtained from his employer.

2.      Li was an investment analyst at Investment Adviser 1, a registered investment adviser focused on the healthcare sector. That position gave him access to confidential information about upcoming securities offerings and clinical drug data that his employer had agreed to keep secret.

3.      Li used that information to trade for himself. The pattern was the same every time. His employer would receive confidential information about a healthcare company, including the terms of an upcoming private placement, the results of a clinical drug trial, or both. Li was included on the communications through which his employer received that information. Before the information became public, Li traded in that company's securities, buying when the news was favorable and selling short when it was not. When the company made its announcement, the stock price moved sharply. Li closed his position and pocketed the profit. He did this at least twelve times.

4.      Li hid his trading from his employer, whose written policies prohibited trading in healthcare securities. He signed annual certifications stating he had read those policies and would follow them. He never sought preclearance for any trade or disclosed his personal brokerage accounts to his employer.

5.      Li's total illicit profits were approximately $327,883.

## VIOLATIONS

6.      By virtue of the foregoing conduct and as alleged further herein, Li has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7.      Unless Li is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A [15 U.S.C. § 78u-1(a)].

2

9.     The Commission seeks a final judgment: (a) permanently enjoining Li from violating the federal securities laws and rules this Complaint alleges he violated; (b) ordering Li to disgorge all ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Li to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) permanently enjoining Li from directly or indirectly acting as or being associated with an investment adviser; and (e) ordering any further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

11.     Li, directly or indirectly, has made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged herein.

12.     Venue in this District is proper under Exchange Act Section 27 [15 U.S.C. § 78aa] because Li resides and transacted business in this District, and certain of the acts, practices, transactions, and courses of business constituting the alleged securities law violations occurred within this District. For example, Investment Adviser 1, Li's employer from whom Li misappropriated material non-public information, is located in this District, and Li's unlawful trading occurred on the Nasdaq Stock Market ("NASDAQ") and New York Stock Exchange ("NYSE"), which are headquartered in this District.

3

**DEFENDANT**

13.     **Li**, age 40, resides in New York, NY. Between May 2022 and May 2026, Li was employed at Investment Adviser 1 as an investment analyst. Li previously served as an Executive Director at a foreign investment adviser, as a research fellow at a global pharmaceutical company, and as a board member of a clinical-stage biopharmaceutical company.

**OTHER RELEVANT INDIVIDUALS AND ENTITIES**

14.     **Hexa Advisor LLC** ("Hexa") is a New York limited liability company with its principal place of business in New York, New York. Hexa is a family investment vehicle owned and managed by Li.

15.     **Investment Adviser 1** is a Delaware corporation with its principal place of business in New York, New York. Investment Adviser 1 is an investment adviser focusing on investments in the healthcare sector. It has been registered with the Commission since 2020.

16.     **Avalo Therapeutics, Inc**. ("Avalo") is a Delaware corporation headquartered in Rockville, Maryland. Avalo is a clinical-stage biotechnology company that develops therapies for immune dysregulation disorders. During the relevant period, Avalo's common stock traded on NASDAQ under the symbol "AVTX."

17.     **Mind Medicine Inc**. ("Mind Medicine") is a British Columbia, Canada corporation headquartered in New York, New York. Mind Medicine is a clinical-stage biopharmaceutical company that develops treatments for brain health disorders. During the relevant period, Mind Medicine's common stock traded on NASDAQ under the symbol "MNMD."

18.     **Vincerx Pharma, Inc**. ("Vincerx") is a Delaware corporation headquartered in San Mateo, California. Vincerx is a clinical-stage biopharmaceutical company that develops

4

therapies for cancer patients. During the relevant period, Vincerx's common stock traded on NASDAQ under the symbol "VINC."

19.     **Palisade Bio, Inc**. ("Palisade") is a Delaware corporation headquartered in Denver, Colorado. Palisade is a clinical-stage biopharmaceutical company that develops oral therapies for inflammatory bowel diseases. During the relevant period, Palisade's common stock traded on NASDAQ under the symbol "PALI."

20.     **PepGen Inc**. ("PepGen") is a Delaware corporation headquartered in Boston, Massachusetts. PepGen is a clinical-stage biotechnology company that develops therapeutics for genetic neuromuscular and neurological diseases. During the relevant period, PepGen's common stock traded on NASDAQ under the symbol "PEPG."

21.     **Regulus Therapeutics Inc**. ("Regulus") is a Delaware corporation headquartered in San Diego, California. Regulus is a clinical-stage biopharmaceutical company that develops drugs targeting microRNAs to treat diseases. During the relevant period, Regulus's common stock traded on NASDAQ under the symbol "RGLS."

22.     **Altimmune, Inc**. ("Altimmune") is a Delaware corporation headquartered in Gaithersburg, Maryland. Altimmune is a late-stage clinical biopharmaceutical company that develops therapies for liver diseases. During the relevant period, Altimmune's common stock traded on NASDAQ under the symbol "ALT."

23.     **Tenax Therapeutics, Inc**. ("Tenax") is a Delaware corporation headquartered in Chapel Hill, North Carolina. Tenax is a development-stage pharmaceutical company that develops cardiopulmonary therapies. During the relevant period, Tenax's common stock traded on NASDAQ under the symbol "TENX."

24.    **Cybin Inc**. ("Cybin") is an Ontario, Canada corporation headquartered in Toronto, Canada. Cybin is a clinical-stage neuropsychiatry company that develops psychedelic-based therapeutics for mental health conditions. During the relevant period, Cybin's common stock traded on NYSE under the symbol "CYBN." Cybin currently trades on NASDAQ under the symbol "HELP."

25.    **Applied Therapeutics, Inc**. ("Applied Therapeutics") is a Delaware corporation headquartered in New York, New York. Applied Therapeutics is a clinical-stage biopharmaceutical company that develops drugs for rare diseases. During the relevant period, Applied Therapeutics' common stock traded on NASDAQ under the symbol "APLT."

26.    **FibroGen Inc**. ("FibroGen") is a Delaware corporation headquartered in San Francisco, California. FibroGen is a biopharmaceutical company that develops oncology and anemia therapies. During the relevant period, FibroGen's common stock traded on NASDAQ under the symbol "FGEN."

27.    **Benitec Biopharma Inc**. ("Benitec") is a Delaware corporation headquartered in Hayward, California. Benitec is a clinical-stage biotechnology company that develops genetic medicines. During the relevant period, Benitec's common stock traded on NASDAQ under the symbol "BNTC."

## TYPES OF SECURITIES TRADED

28.    In furtherance of his insider trading scheme, Li strategically employed both "long" and "short" investment positions.  Li established "long" positions—bets that a security's price would rise—by purchasing shares of common stock and call options.  He established "short" positions—bets that a security's price would fall—by executing short sales of common stock and purchasing put options.

6

29.    A call option is a specific type of options contract that gives the owner the right, but not the obligation, to buy 100 shares of the underlying stock at a set price per share, known as the option's strike price, on or before a set future date, known as the option's expiration date.

30.    Generally, the holder of a call option benefits when the price of the underlying stock increases.

31.    A put option is a specific type of options contract that gives the owner the right, but not the obligation, to sell 100 shares of the underlying stock at a set price per share, known as the option's strike price, on or before a set future date, known as the option's expiration date.

32.    Generally, the holder of a put option benefits when the price of the underlying stock decreases.

**FACTS**

I.    **LI'S POSITION AND THE ACCESS IT PROVIDED.**

A.    **Li Was a Sophisticated Investment Professional With Healthcare Expertise.**

33.    From May 2022 to May 2026, Li was employed as an investment analyst at Investment Adviser 1.

34.    Before working at Investment Adviser 1, Li served as an Executive Director at a foreign investment adviser. Before that, he was a research fellow at a global pharmaceutical company. Li has also served as a board member of a clinical-stage biopharmaceutical company.

35.    Li's professional background gave him substantial expertise in the healthcare and biopharmaceutical sectors, including familiarity with clinical drug development, securities offerings, and restrictions on trading in securities that applied to him by virtue of his employment at an investment adviser.

**B.      Investment Adviser 1 Focused on the Healthcare Sector and Regularly Received Confidential Information About Upcoming Offerings.**

36.     During the relevant period, Investment Adviser 1 focused on investments in the healthcare sector and advised private funds.

37.     As part of its investment business, Investment Adviser 1 regularly participated in a process known as a "wall-crossing."

38.     A wall-crossing works as follows. An investment bank contacts a potential investor or adviser and asks whether that investor or adviser will agree to receive confidential information about an upcoming securities offering. If the investor or adviser agrees, it is "wall-crossed" and receives this confidential information. In exchange for access to that information, the investor or adviser agrees to keep it secret and use it only to decide whether to participate in the offering.

39.     After Investment Adviser 1 agreed to be wall-crossed, it received confidential information about the relevant issuer. That information typically included the issuer's identity, the likely timing and size of the offering, data from the issuer's clinical drug trials, and/or information about the issuer's drug pipeline or pending corporate transactions.

40.     This information was not available to the public. It was shared with Investment Adviser 1 in confidence, subject to its agreement to maintain its secrecy.

41.     By agreeing to be wall-crossed, Investment Adviser 1 took on a duty of trust and confidence to the investment banks and issuers that shared confidential information with it. That duty required Investment Adviser 1 and its employees to keep the information secret and not trade on it.

**C.      Li Was Included in Wall-Cross Communications and Received Confidential Information Directly.**

42.      When Investment Adviser 1 agreed to be wall-crossed on a potential offering, it copied its investment analyst team, including Li, on the wall-crossing email chain.

43.      Li was also copied on the emails through which Investment Adviser 1 received or was given access to the confidential offering information.

44.      In some instances, Investment Adviser 1 entered into written confidentiality or nondisclosure agreements directly with the issuer. In those instances, Li received copies of the executed agreements and access to the confidential information shared under them.

45.      In addition to receiving the wall-cross emails, Li also received confidential slide decks, access credentials to virtual data rooms, and internal communications in which his colleagues analyzed and discussed the confidential information.

46.      As an employee of Investment Adviser 1, Li owed a duty of trust and confidence to his employer to keep confidential any information he received in the course of his employment, including information received through wall-crossings, confidentiality agreements, and nondisclosure agreements, and not to use that information for his personal benefit. Additionally, as detailed below, Li expressly agreed to keep that information confidential.

**D.      Investment Adviser 1 Maintained a Restricted Trading List to Enforce Its Confidentiality Obligations.**

47.      After agreeing to be wall-crossed on a potential offering, Investment Adviser 1 added the relevant issuer to its Restricted Trading List.

48.      The Restricted Trading List identified securities that Investment Adviser 1's employees were prohibited from trading, in their personal accounts or otherwise, while Investment Adviser 1 was in possession of confidential information about the issuer.

49.    An issuer remained on the Restricted Trading List until the confidential information became public.

50.    If an employee of Investment Adviser 1 wanted to buy or sell any security, the employee was required to submit a preclearance request to the firm's Chief Compliance Officer. The Chief Compliance Officer would then check the requested security against the Restricted Trading List. If the issuer appeared on that list, the request would be denied.

51.    Li knew about the Restricted Trading List and that he was subject to it.

## II.    LI'S DUTY TO MAINTAIN THE CONFIDENTIALITY OF AND NOT TRADE BASED ON MATERIAL NONPUBLIC INFORMATION.

52.    When Li joined Investment Adviser 1 in May 2022, the firm required him to divest any interest he held in healthcare securities. During his employment at Investment Adviser 1, Li's personal trading in securities, including securities in the healthcare sector, was governed by Investment Adviser 1's written compliance policies.

53.    Those policies included an Insider Trading Policy and a Code of Ethics, and Li received both documents when he joined the firm. Li acknowledged receiving, reading, and understanding both documents when he joined the firm and each year he was at the firm.

54.    Investment Adviser 1's Code of Ethics designated Li as an "Access Person," which means a person with access to the firm's confidential investment information.

55.    As an Access Person, Li was subject to the full suite of obligations in the Code of Ethics. The Code of Ethics imposed a blanket prohibition on personal trading in healthcare securities. The relevant provision stated:

> The Firm's investment strategy focuses primarily on investing in securities within the healthcare sector. As stated above, the Firm has a fiduciary duty to place its client's interests ahead of its own or its employees. To avoid conflicts of interest or the appearance of any impropriety, Access Persons are strictly prohibited from

personally investing, directly or indirectly, in any security, ETF or mutual fund within the healthcare sector . . . .

56.    This prohibition applied regardless of whether Li possessed material nonpublic information about a particular issuer. Li was prohibited from trading in any healthcare security, at any time, for any reason.

57.    The Code of Ethics also required Li to obtain written preclearance for personal trades in "single name equities and ETFs" from Investment Adviser 1's Chief Compliance Officer.

58.    The Code of Ethics contained a specific prohibition tied to the Restricted Trading List. The relevant provision stated: "No Access Person may engage in any transaction in any security on the Firm's Restricted Trading List, even if such security was held in Access Person's Personal Account prior to joining the Firm[.]"

59.    The Insider Trading Policy—which Li had reviewed and was subject to—imposed a separate and independent prohibition. The relevant provision stated: "No person to whom these procedures apply may trade, either personally or on behalf of others . . . while in possession of material, nonpublic information[.]"

60.    In addition to these substantive prohibitions, Investment Adviser 1's compliance policies imposed procedural obligations on Li.

61.    Each quarter, Li was required to report to his employer all personal securities transactions and provide brokerage account statements for any account in which he had direct or indirect beneficial ownership, including accounts held through entities he controlled. Li certified each quarter that he was fully familiar with the firm's Code of Ethics and that the report he submitted was "true, accurate, and complete" for that quarter.

11

62.    Li was also required to disclose all brokerage accounts and securities he held when he joined the firm and to update that disclosure each year thereafter. Li certified annually that he had accurately reported his brokerage accounts and their holdings.

## III.    LI TRADED WHILE IN POSSESSION OF MATERIAL NONPUBLIC INFORMATION AT LEAST TWELVE TIMES.

63.    From February 2024 through October 2025, Li traded in the securities of at least twelve healthcare companies in violation of Investment Adviser 1's policies and procedures.

64.    Each trade followed the same pattern. Investment Adviser 1 received confidential information about a healthcare issuer after being wall-crossed or signing a confidentiality or nondisclosure agreement. Li was included on the communications through which Investment Adviser 1 received that information, including wall-cross emails, slide decks, virtual data room credentials, and his colleagues' internal analyses.

65.    While the issuer remained on Investment Adviser 1's Restricted Trading List, Li traded in that issuer's securities through his personal brokerage account and/or the account of Hexa, an LLC he controlled ("Hexa account").

66.    When the issuer publicly disclosed the confidential information, the stock price moved sharply, rising on positive news or falling on negative news. Li then closed his position for a profit.

67.    Li traded in both directions depending on the confidential information he received. When the information was positive, such as a drug approval, a successful clinical trial, or an oversubscribed offering, he bought shares or call options before the announcement. When the information was negative, such as disappointing clinical data, he sold short or bought put options before the announcement. In each case, shortly after its public revelation, the stock price moved as the information predicted, and Li profited.

68.    Li never sought preclearance for any of these trades from Investment Adviser 1 notwithstanding that Investment Adviser 1's policies required written approval before executing any personal trade in a single-name equity security or ETF.

69.    Li never disclosed any of these trades to Investment Adviser 1 notwithstanding Investment Adviser 1's requirement that he submit quarterly transaction reports and annual holdings reports identifying all accounts over which he had direct or indirect beneficial ownership and all trades in those accounts.

70.    Li also traded through the Hexa account, which he never disclosed to Investment Adviser 1. Hexa had filed a Certificate of Dissolution with New York State on August 18, 2023. Li continued to trade through the Hexa account through April 2024, months after dissolution.

71.    Li's total illicit profits from his trading in the twelve issuers were approximately $327,883.

72.    The following paragraphs describe five of the twelve trades in detail. The remaining seven are summarized in the table in paragraph 114.

A.    **Avalo Therapeutics**

73.    On February 7, 2024, Investment Bank 1 contacted Investment Adviser 1 about a potential $185 million private securities offering by Avalo. Investment Adviser 1 agreed to be wall-crossed and received confidential information about Avalo's planned merger with AlmataBio, Inc., ("AlmataBio") to acquire a Phase-2 ready drug, and the securities offering.

74.    Li was included on the wall-cross email and received Avalo's slide deck detailing the securities offering, the merger with AlmataBio, and the Phase-2 ready drug.

75.    On February 8, 2024, Investment Adviser 1 signed a confidentiality agreement with Avalo. The agreement was then emailed to Li, and Investment Adviser 1 added Avalo to its Restricted Trading List that same day.

76.    On February 9, 2024, Li received access to Avalo's virtual data room, which contained confidential information about the merger with AlmataBio and the Phase-2 ready drug.

77.    The information was not public when Li received it.

78.    Between March 14 and March 26, 2024, while Avalo was on the Restricted Trading List and Li possessed that confidential information, Li bought 6,528 shares of Avalo common stock in his personal brokerage account and the Hexa account.

79.    After markets closed on March 27, 2024, Avalo announced the acquisition of the Phase-2 ready drug through a merger with AlmataBio and the $185 million private offering.

80.    The next day, Avalo's stock price surged 357.89%, from $4.75 to $21.75.

81.    Li sold all 6,528 shares of Avalo common stock that day, obtaining profits of $89,863.

82.    The merger with AlmataBio, the Phase 2-ready drug, and the $185 million fundraise were material. A reasonable investor would have considered that information important in deciding whether to buy or sell Avalo stock, as the 357.89% price increase confirms.

**B.      Vincerx Pharma**

83.    On February 22, 2024, Investment Adviser 1 entered into a confidentiality agreement with Vincerx and added Vincerx to its Restricted Trading List. Under that agreement, Investment Adviser 1 received confidential information about Vincerx, including data from two drug trials.

14

84. Li received an email dated February 27, 2024 from his Investment Adviser 1 colleague with the subject line "VINC follow up call under CDA 2-26-2024." The colleague assessed the drug trial data and characterized the results as "not so interesting."

85. Li was included on an email dated March 28, 2024 from the same colleague with notes from a March 25, 2024 meeting with Vincerx. The colleague wrote that Vincerx planned to release its drug data at an industry conference in mid-April, which would "cleanse us of [Investment Adviser 1's] restriction to trade," and that "I don't think the data they generated is too exciting so far and [Investment Adviser 1] should consider selling out when the data is out."

86. That information was not public when Li received it.

87. Between April 3 and April 8, 2024, while Vincerx remained on the Restricted Trading List and Li possessed that confidential information, Li sold short 12,500 shares of Vincerx common stock in the Hexa account, positioning himself to profit if the stock's price fell.

88. On April 8, 2024, after markets closed, Vincerx publicly announced preliminary Phase 1 data for its VIP236 drug at an industry conference. The results disappointed investors, as Li's colleague had predicted. Vincerx's stock fell 77.6% the next day.

89. On April 9, 2024, Li bought 12,500 shares of Vincerx common stock to cover his short position, realizing a profit of $52,299.

90. The drug trial data was material information. A reasonable investor would have considered it important in deciding whether to buy or sell Vincerx stock, as the 77.6% price decline confirms.

### C.    **Applied Therapeutics**

91.    On February 26, 2024, Investment Bank 2 contacted Investment Adviser 1 about a potential offering by Applied Therapeutics. Investment Adviser 1 agreed to be wall-crossed and added the company to its Restricted Trading List that same day.

92.    Through the wall-crossing, Li received confidential information about Applied Therapeutics, including the FDA's acceptance and priority review of its new drug application and a concurrent private placement offering.

93.    That information was not public when Li received it.

94.    On February 27, 2024, while Applied Therapeutics was on the Restricted Trading List and Li possessed that confidential information, Li bought 31 Applied Therapeutics call options and two shares of Applied Therapeutics common stock in his personal brokerage account.

95.    On February 28, 2024, before markets opened, Applied Therapeutics announced the FDA's acceptance and priority review of its new drug application and a $100 million private placement. The stock rose 32.6%.

96.    The same day, Li sold the 31 call options and two shares of common stock, realizing a profit of $6,940.

97.    The FDA's acceptance and priority review and the $100 million private placement were material. A reasonable investor would have considered that information important in deciding whether to buy or sell Applied Therapeutics stock, as the 32.6% price increase confirms.

D.    **Mind Medicine**

98.    On March 6, 2024, Investment Bank 2 contacted Investment Adviser 1 about a private placement offering by Mind Medicine. Investment Adviser 1 agreed to be wall-crossed at approximately 8:20 a.m. and added Mind Medicine to its Restricted Trading List that same day.

99.    Li was included on the wall-cross email and subsequent email providing a link and access code to the Mind Medicine offering slide deck.

100.    Li was included on a March 6, 2024 email from a colleague with subject line "MNMD PIPE call 20240306," in which the colleague summarized Mind Medicine's drug data: "12 week durability very good. . . . Also MNMD do not requires [sic] psychotherapy, only need safety monitoring. Next step for them is meeting with the FDA for EoP2 and Phase 3 initiation in 2H 2024."

101.    That information was not public when Li received it.

102.    That same day, while Mind Medicine was on the Restricted Trading List and Li possessed that confidential information about the company, Li bought 415 Mind Medicine call options across two tranches: 115 contracts expiring March 15, 2024 at a $6 strike price, and 300 contracts expiring April 19, 2024 at a $7 strike price. Li placed these trades in both his personal brokerage account and the Hexa account.

103.    On March 7, 2024, before markets opened, Mind Medicine announced that the FDA had granted Breakthrough Therapy designation for one of its drug programs, that its Phase 2B study had met its primary endpoint, and that it had entered into an underwritten public offering. The stock rose 51.51%, from $5.94 to $9.00.

104.    Between March 7 and March 11, 2024, Li sold all 415 call options, realizing a profit of $88,188.

105.    The FDA Breakthrough Therapy designation, positive Phase 2B trial results, and the underwritten public offering were material. A reasonable investor would have considered that information important in deciding whether to buy or sell Mind Medicine stock, as the 51.51% price increase confirms.

### E.    PepGen

106.    On September 22, 2025, Investment Bank 2 contacted Investment Adviser 1 about a private placement offering by PepGen. Investment Adviser 1 agreed to be wall-crossed that same day, received confidential information about the offering—including that it would be announced concurrently with clinical data about PepGen's drug for the treatment of myotonic dystrophy type 1 ("DM1")—and added PepGen to its Restricted Trading List.

107.    Li was included on the wall-cross email.

108.    On September 24, 2025, Li received an email from a colleague with the subject line "PEPG WX20250922." The colleague wrote that the deal was being accelerated and would "close tonight," and that the "biomarker data is good (54% splicing correction is BIC, also all 6 patient are responder which is good)."

109.    That information was not public when Li received it.

110.    On September 24, 2025, while PepGen was on the Restricted Trading List and Li possessed that confidential information, Li bought 81 PepGen call options: 23 contracts expiring October 17, 2025 at a $2 strike price and 58 contracts expiring October 17, 2025 at a $3 strike price.

111.    After markets closed the same day, PepGen announced the offering and positive clinical data for its DM1 drug, citing the "highest mean splicing correction reported in DM1 patients." PepGen's stock price rose 121% the next day.

112. On September 25, 2025, Li sold all 81 PepGen call options, realizing a profit of $22,601.

113. The DM1 clinical data was material information. A reasonable investor would have considered it important in deciding whether to buy or sell PepGen stock, as the 121% price increase confirms.

**F.    The Remaining Seven Transactions Follow the Same Pattern.**

114. The remaining seven transactions are summarized in the chart below.

| Issuer (Ticker) | Wall-Cross | Confidential Information Li Received | Li's Trade | Announcement | Price Move | Li's Profit |
|---|---|---|---|---|---|---|
| Regulus Therapeutics (RGLS) | 3/5/2024 | Positive clinical trial data; oversubscribed private placement | Bought 13,156 shares, Mar. 11, 2024 | Mar. 12, 2024 (pre-open): positive clinical data and $100M placement pricing | +71% | $16,910 |
| Cybin Inc. (CYBN) | 3/7/2024 | Positive clinical trial data; over $100M private placement | Bought 127,600 shares, Mar. 7, 2024 | Mar. 13, 2024 (pre-open): positive clinical data and $150M private placement | +18.2% | $7,032 |
| FibroGen Inc. (FGEN) | 3/26/2024 | "Unexciting" clinical trial data | Sold short 17,000 shares, Mar. 28-Apr. 2, 2024 | Apr. 2, 2024 (after close): study results | -31% | $6,928 |
| Benitec Biopharma (BNTC) | 4/15/2024 | Positive interim clinical trial data; private placement | Bought 7,604 shares, Apr. 16-17, 2024 | Apr. 18, 2024 (pre-open): positive interim clinical data and $40M private placement | +42% | $5,567 |

19

| Issuer (Ticker) | Wall-Cross | Confidential Information Li Received | Li's Trade | Announcement | Price Move | Li's Profit |
|---|---|---|---|---|---|---|
| Tenax Therapeutics, Inc. (TENX) | 7/24/2024 | Oversubscribed private placement | Bought 6,000 shares, Aug. 2-5, 2024 | Aug. 6, 2024 (pre-open): oversubscribed $100M PIPE | +28.76% | $9,800 |
| Altimmune Inc. (ALT) | 6/23/2025 | Mixed clinical trial results indicating a disappointing outcome | Bought 47 put options, Jun. 25, 2025 | Jun. 26, 2025 (pre-open): mixed clinical trial results | -53.17% | $10,169 |
| Palisade Bio (PALI) | 9/9/2025 | Upsized offering of over $100M with significant investor demand | Bought 26,400 shares, Sep. 29-30, 2025 | Oct. 1, 2025 (pre-open): pricing of upsized $120M underwritten public offering | +52.3% | $11,586 |

115.    In each transaction, Investment Adviser 1 was wall-crossed or entered into a confidentiality agreement; Li received the confidential information; Li traded while the issuer was on the Restricted Trading List; the issuer made a public announcement; the stock price moved sharply; and Li profited.

116.    Between at least February 2024 and at least October 2025, Li obtained over $320,000 in illicit profits from his trading in the twelve issuers discussed herein.

## IV.    LI TOOK DELIBERATE STEPS TO HIDE HIS TRADING FROM HIS EMPLOYER.

117.    Li concealed every one of his twelve trades from Investment Adviser 1.

118.    Li never sought preclearance for any of those trades. Investment Adviser 1's policies required written approval before executing any personal trade in a single-name equity security. Li sought approval zero times.

119.    Li never disclosed his personal brokerage account to Investment Adviser 1. Firm policy required him to identify all personal brokerage accounts in his initial holdings report, annual holdings reports, and quarterly transaction reports. He disclosed none of them.

120.    Li also traded through Hexa and never disclosed his ownership and control of Hexa or the Hexa account. Firm policy required him to disclose every account over which he had direct or indirect beneficial ownership, including accounts held through entities he controlled. He disclosed none.

121.    Each year, Li signed a compliance certification representing that he had read, understood, and complied with Investment Adviser 1's Insider Trading Policy and Code of Ethics. Li had not complied and those certifications were false.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

122.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 121.

123.    Defendant Li, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

124.    By reason of the foregoing, Defendant Li, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendant Li from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

### II.

Ordering Defendant Li to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)];

### III.

Ordering Defendant Li to pay civil monetary penalties pursuant to Section 21A [15 U.S.C. § 78u-1];

### IV.

Permanently enjoining Defendant Li from directly or indirectly acting as or being associated with an investment adviser under Exchange Act Section 21(d)(1) and (5) [15 U.S.C. § 78u(d)(1) and (5)] (for purposes of this paragraph, a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs

similar functions), or directly or indirectly controls or is controlled by such investment adviser,

including any employee of such investment adviser); and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
       June 5, 2026

/s/ Christopher M. Colorado

Mark R. Sylvester
Janna Berke
Christopher M. Colorado
Kim Han
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-9143 (Colorado)
coloradoch@sec.gov